# EXHIBIT A

James L Haddock, Prothonotary
Printed:  06/25/2021 11:23:32 AM

Case #:        202105609

Rec Date:      06/03/2021  02:20:39 PM
Doc Grp/Desc:  CIV / COMPLAINT

Plaintiff:     INDEPENDENT WRESTLING TV LLC
                   67-69 PUBLIC SQUARE  STE 600
                   WILKES BARRE  PA  18701
               Counsel: ANDERSON , LARS

Defendant:     GAME CHANGER WRESTLING LLC
                   343 TAVISTOCK BOULEVARD
                   HADDONFIELD  NJ  08033


---- DOCKET ITEMS -----
Rec Date      Description
_____    _____

06/03/2021    COMPLAINT
              Fee: $170.75
06/03/2021    AOPC COVER SHEET
              Fee: $0.00

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet
LUZERNE _____ County

| For Prothonotary Use Only: | PROTHONOTARY LUZERNE COUNTY FILED JUN 3 '21 PM 2:22 |
|---|---|
| Docket No: 2021-05609 | |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Transfer from Another Jurisdiction
- ☐ Writ of Summons
- ☐ Petition
- ☐ Declaration of Taking

| Lead Plaintiff's Name: INDEPENDENT WRESTLING TV, LLC | Lead Defendant's Name: GAME CHANGER WRESTLING, LLC |
|---|---|

Are money damages requested?  ☒ Yes  ☐ No

Dollar Amount Requested: (check one)  ☐ within arbitration limits  ☒ outside arbitration limits

Is this a *Class Action Suit*?  ☐ Yes  ☒ No

Is this an *MDJ Appeal*?  ☐ Yes  ☒ No

Name of Plaintiff/Appellant's Attorney:  LARS H. ANDERSON, ESQUIRE

☐ Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**SECTION B**

**TORT** (do not include Mass Tort)
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability (does not include mass tort)
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** (do not include Judgments)
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other _____
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
- ☒ Other: _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other _____
- ☐ Zoning Board
- ☐ Other: _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____

*Updated 1/1/2011*

HOURIGAN, KLUGER & QUINN, PC
PROFESSIONAL CORPORATION
BY: Lars H. Anderson, Esquire

Attorney for the Plaintiff

IDENTIFICATION NO. 209106
LAW OFFICES
600 THIRD AVENUE
KINGSTON, PA 18704-5815
(570) 287-3000

PROTHONOTARY LUZERNE COUNTY
FILED JUN 3'21 PM 2:22

| | | |
|---|---|---|
| INDEPENDENTWRESTLING.TV, LLC,<br>67-69 Public Square, Ste. 600<br>Wilkes-Barre, PA 18701, | : | Luzerne County<br>Court of Common Pleas |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION - LAW |
| v. | : | |
| | : | |
| GAME CHANGER WRESTLING, LLC,<br>343 Tavistock Boulevard<br>Haddonfield, NJ 08033, | : | No.: 2021-05609 |
| | : | |
| Defendant. | : | |
| | : | |

## COMPLAINT

The Plaintiff, IndependentWrestling.TV, LLC ("IndependentWrestling"), by and through

its counsel, Hourigan, Kluger & Quinn, P.C, hereby files this Complaint against the Defendant,

Game Changer Wrestling, LLC ("Game Changer"), and asserts as follows:

## THE PARTIES

1.      The Plaintiff, IndependentWrestling, is a Pennsylvania Limited Liability Company

having a principal place of business as 67-69 Public Square, Ste. 600, Wilkes-Barre, Pennsylvania

18701.

2.      The Defendant, Game Changer, is a New Jersey Limited Liability Company having

a principal place of business as  343 Tavistock Boulevard, Haddonfield, New Jersey 08033.

2498267_1

## **FACTUAL BACKGROUND**

3.      The Plaintiff hereby incorporates Paragraphs 1 through 2 herein by reference.

4.      The Plaintiff operates a subscription-model livestreaming service focused on independent wrestling that allows subscribers to view live-streamed events as well as archived programs over an internet connection.

5.      The Defendant is an independent wrestling production company that arranges and puts on live independent wrestling events.

6.      The Plaintiff and Defendant entered into a Distribution Agreement dated March 19, 2020, for the purpose of Plaintiff producing and videoing the Defendant's wrestling events so that they may be live streamed on either the Plaintiff's online platform or another online platform, or distributed via the Plaintiff's subscription service.  A true and correct copy of the Distribution Agreement executed by the Parties is attached hereto as Exhibit "A" and incorporated herein by reference.

7.      Paragraph 2 of the Distribution Agreement grants to the Plaintiff an exclusive license during the term of the contract to produce and distribute the Defendant's Pay-Per-View events and the Defendant's Programs throughout the world.  See Exhibit "A", Paragraph 2A.

8.      The contract defines Pay-Per-View events as specific programs, either live streamed or archived which a viewer can purchase to view either once or a specified number of times via private stream or broadcast, and not included in Plaintiff's subscription service.   See Exhibit "A", Paragraph 1.

9.      The contract defines Programs as audiovisual content (including any related metadata, identifying information or other supplemental information) that Provider makes available to Distributor pursuant to the Agreement.  Programs include Archived Content as well

2

as Live Streamed Events. Distributor operates a subscription model to provide Programs to its subscribers. The subscription service does not include Pay per View Events.

10.   On December 1, 2020, Defendant notified Plaintiff of Defendant's intent to breach the Distribution Agreement by producing and live streaming Defendant's Pay-Per-View events through an alternate platform. A true and correct copy of the December 1, 2020 correspondence is attached hereto as Exhibit "B" and incorporated herein by reference.

11.   Defendant proceeded to have Pay-Per-View events on December 5, 2020, December 31, 2020 and January 1, 2021 in violation of the Distribution Agreement with Plaintiff.

12.   On December 7, 2020, counsel for the Plaintiff notified Defendant that its actions of utilizing a different production company and distribution system for the events on December 5, 2020, December 31, 2020 and January 1, 2021 were a violation of the signed Distribution Agreement between the parties. A true and correct copy of the December 7, 2020 correspondence is attached hereto as Exhibit "C" and incorporated herein by reference.

13.   Nevertheless, Defendant continued to conduct live stream Pay-Per-View events utilizing a different production company and distribution system in violation of the Distribution Agreement on the dates detailed above as well as January 29-30, 2021; February 13, 2021; February 20, 2021; March 6, 2021; April 8-10, 2021; May 1, 2021 and May 15, 2021 for a total of approximately thirty-six (36) events to date.

14.   Further, counsel notified Defendant that it was in breach of Paragraph 4C of the Distribution Agreement by failing to provide the requisite number of live stream events per month. See Exhibit "C".

15.   Paragraph 4C of the Distribution Agreement states that Defendant "agrees to provide an average of one (1) live stream program per month to (Plaintiff), with the allowance that if there are no streams in any given month then (Plaintiff) shall receive two (2) live stream

3

programs the following month." Since the signing of the Distribution Agreement, Defendant has provided to Plaintiff four (4) live stream events, which is eight (8) events less than required under the terms of the Distribution Agreement.

**COUNT I**
**BREACH OF CONTRACT**

16.   The Plaintiff hereby incorporates Paragraph 1 through 15 herein by reference.

17.   By failing to provide one (1) live stream event per month, the Defendant has breached the terms of the Distribution Agreement.

18.   By Defendant using an alternate production company and distribution systems for its live stream and Pay-Per-View events, Defendant has breached the terms of the Distribution Agreement.

19.   Plaintiff has notified Defendant of its breach of the Distribution Agreement and Defendant has failed to cure said breach.

20.   Defendant continues to breach the terms of the Distribution Agreement by continuing to offer live stream Pay-Per-View events that are not produced by Plaintiff and not live streamed through the Plaintiff's online platform, to date totaling approximately thirty-six (36) events.

21.   Further, Defendant breached Section 8 of the Distribution Agreement by revealing and publicizing the terms of the Distribution Agreement to other promoters.

22.   For the reasons set forth above, Defendant has breached its obligations and duties under the terms of the Distribution Agreement.

23.   At all relevant times, the Plaintiff has fully complied with the terms and conditions and duties imposed under the Distribution Agreement and all demands made upon Plaintiff by Defendant.

4

2498267_1

24.     At this time, Plaintiff cannot totally calculate damages until it gets a full accounting from Defendant as to the revenue generated by Defendant's live stream events, but it is believed the damages are in excess of $500,000.

WHEREFORE, the Plaintiff, hereby requests that this Honorable Court enter judgment in its favor and against the Defendant in the amount in excess of Five Hundred Thousand Dollars ($500,000.00) plus interest, cost of suit, attorneys' fees and award of such other relief as this Honorable Court in its sound discretion deems necessary and appropriate.

**COUNT II**
**DETRIMENTAL RELIANCE**

25.     The Plaintiff hereby incorporates Paragraphs 1 through 24 herein by reference.

26.     Defendant through its duly authorized representatives deliberately made or permitted to be made representations to Plaintiff that it would provide Plaintiff with at least one live stream event per month and that Plaintiff would have the exclusive right to distribute and produce Defendant's live stream events and Pay-Per-View events.

27.     Upon information and belief, it is alleged that the aforesaid misrepresentations were communicated to Plaintiff with the expectation that they would influence Plaintiff's conduct such that Plaintiff would enter into the contract with Defendant.

28.     The Plaintiff was induced by and justifiably relied upon the misrepresentations of Defendant.

29.     The Plaintiff's justifiable reliance upon the misrepresentations of Defendant was a direct and proximate cause in determining the actions which resulted in Plaintiff's losses and damages.

30.     As a direct and proximate result of the misrepresentations of Defendant's duly authorized representatives and Plaintiff's reliance upon them, Plaintiff's reliance upon them,

5

Plaintiff has been injured and damaged by Defendant's failure to provide Plaintiff with one live stream event per month and to honor of the exclusive Distribution Agreement.

WHEREFORE, the Plaintiff, hereby requests that this Honorable Court enter judgment in its favor and against the Defendant in the amount in excess of Five Hundred Thousand Dollars ($500,000.00 ) plus interest, cost of suit, attorneys' fees and award of such other relief as this Honorable Court in its sound discretion deems necessary and appropriate.

Respectfully submitted.
HOURIGAN, KLUGER & QUINN, P.C.

By: _____

Lars H. Anderson, Esquire
I.D. No.: 209106
Attorney for Plaintiff

600 Third Avenue
Kingston, PA 18704-5815
(570) 287-3000 (Telephone)
(570) 287-8005 (Facsimile)
landerson@hkqlaw.com

6

2498267_1

## CERTIFICATE OF COMPLIANCE

I, Lars H. Anderson, certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Respectfully submitted.

By: _____

Lars H. Anderson, Esquire
I.D. No.: 209106

2498267_1

## VERIFICATION

I, Jeffrey J. Pyros, a member of IndependentWrestling.TV, LLC, hereby certify that I have the authority to make this verification on behalf of IndependentWrestling.TV, LLC. The statements contained in the foregoing are true and correct to the best of my knowledge or information and belief. I understand that this verification is made subject to the penalties of 18 Pa. C.S. §4904 relating to unsworn falsification to authorities.

Jeffrey J. Pyros, Member
IndependentWrestling.TV, LLC

2498267_1

Exhibit "A"

2498267_1

# DISTRIBUTION AGREEMENT

This Distribution Agreement (the "Agreement") is entered into as of *March 19*, 2020, (the "Effective Date") by and between **Game Changer Wrestling, LLC,** a New Jersey Limited Liability Company, with its principal place of business at 315A Princeton Road, Haddonfield, NJ 08033 ("Provider") and **IndependentWrestling.tv, L.L.C.,** a Pennsylvania Limited Liability Company, with principal place of business 67-69 Public Square, Suite 600, Wilkes-Barre, PA, 18701, ("Distributor"), collectively referred to as the "Parties" and individually as a "Party."

## RECITALS:

WHEREAS, Distributor is in the business of distributing video programming by means of a digital media platform and/or other programming distribution services, as further described herein; and

WHEREAS, Provider creates, owns, or controls certain audiovisual Programs as further described herein; and

WHEREAS, Distributor wishes to license from Provider, and Provider wishes to grant to Distributor, the right to distribute these Programs, pursuant to the terms and subject to the conditions of this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements and obligations of the Parties hereunder, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **DEFINITIONS.** The following terms used herein shall have the meanings set forth in this Section 1 and elsewhere in the Agreement.

- **"Advertisements"** means any and all advertising, promotions, sponsorship or other commercial material displayed on the Authorized Distribution Platform.

- **"Affiliate"** means, with respect to a Party, any other person or entity that controls, is under common control with, or is controlled by such Party.

- **"Archived Content"** means Programs made available by the Provider to the Distributor which are not "Live Streamed Events."

- **"Authorized Distribution Platform"** means the software developed and/or operated by Distributor for computers, smartphones, tablets, internet servers, and the like, used for rendering video programming on internet-connected devices.

- **"End User"** means the subscriber or customer of Distributor who pays Distributor a fee to access the Programs.

- **"Licensed Marks"** means, with respect to a Party, the marks, trademarks and logo of such party, each as set forth in Appendix A.

- **"Live Streamed Event"** means the filming, recording, and transmission of an event broadcast live from the Provider's location to the Distributor and then to a customer via an internet connection.

- **"Pay per View (PPV) Event"** means a specific Program, either Live Streamed or Archived, which a viewer can purchase to view either once or a specified number of times via private stream or broadcast. "Pay per View Events" are not included in Distributor's subscription service business model.

- **"Programs"** means the audiovisual content (including any related metadata, identifying information or other supplemental information) that Provider makes available to Distributor pursuant to this Agreement. "Programs" include "Archived Content" as well as "Live Streamed Events." Distributor operates a subscription model to provide "Programs" to its subscribers. The subscription service does not include Pay per View Events.

- **"Prohibited Advertisers"** or **"Prohibited Advertisements"** means advertisers or advertisements which the Distributor, in its sole discretion, does not wish to allow to advertise on its Authorized Distribution Platform.

- **"Territory"** means worldwide.

## 2. GRANT OF RIGHTS.

(a) Provider hereby grants to Distributor an exclusive license during the Term to produce and distribute the Pay per View Events and the Programs in the Territory on all devices now known or hereafter developed.

(b) Except as expressly set forth in this Agreement, as between Provider and Distributor, Provider retains all right, title and interest in and to the Programs, and all rights not expressly granted to Distributor hereunder are reserved by Provider and may be exercised and exploited freely and without limitation or restriction by Provider or its licensees concurrently with Distributor's distribution of the Programs.

## 3. PRODUCTION EXPENSES.

(a) Provider shall be solely responsible for all of the costs of filming and delivering the Live Streamed productions from the Provider's location to the Distributor, including providing a wired internet connection with a bandwidth of at least 5Mbps for use by the video crew for transmission of the live stream.

(b) The cost to Provider for camera operators and production switcher are listed in Appendix C, such schedule which is attached hereto and made a part hereof. These costs shall remain in place for calendar year 2020. Any changes to the costs in subsequent years shall be provided by Distributor to Provider at the beginning of each subsequent calendar year.

(c) Provider shall also be responsible for the travel expenses and, for multi-day events, for lodging expenses for the camera operators and switcher as per Appendix C.

(d) Production expenses shall be calculated and deducted from any payout from the Distributor to the Provider from the revenue share.  Distributor shall provide this calculation to the Provider with the associated payout from every show.

(e) The production expenses detailed in 3(a) and 3(b) above shall only be charged on Pay Per View Events if a total of Three Hundred Ninety-nine (399) or less views/units are sold within four ( 4 ) days of the production date for each specific Event.  If Four Hundred (400) or more views/units are sold, then no production fees shall be charged for that Event.  Transportation and lodging fees shall be charged for all productions as per Appendix C.

(f) A "transaction fee" of Twenty-five percent (25%) of gross sales shall be charged by Distributor on all Pay per View Events.  This "transaction fee" is meant to cover costs to Distributor for bandwidth, merchant fees, and similar.  The "transaction fee" shall be the first expense paid from the gross sales of any Pay per View Events.

(g) There shall be no production expenses charged on any Live Streamed Events which are not Pay per View Events.  However, transportation and lodging fees shall still be charged for all Live Streamed Events as per Appendix C.


## 4. DELIVERY AND DISTRIBUTION.

(a) Unless otherwise agreed by the parties in writing, Provider shall deliver the Programs to Distributor by means of electronic file transfer, multimedia RSS feed, or other electronic file transfer medium as mutually agreed to by both parties.

   (i)   Provider shall deliver the Live Program as an IP stream via Real-time-Streaming Protocol (RTSP), Real-time Transport Protocol (RTP) or HTTP Live Streaming (HLS).

   (ii)  Provider shall deliver a closed captioning stream embedded within the Program feed.

(b) Provider represents that the Programs made available to Distributor do not infringe upon any copyright or intellectual property right of any third party.  Provider shall be solely responsible for any and all license fees, royalties, and similar (including penalties if applicable) payable to third parties in connection with the Programs made available by Provider to Distributor.

(c) Provider agrees to provide an average of One ( 1 ) live stream program per month to Distributor, with the allowance that if there are no streams in any given month then Distributor shall receive Two ( 2 ) live stream programs the following month. Distributor agrees to pay a minimum of One Thousand Dollars ($1000.00) to Provider for each live stream program provided by Provider.

(d) Distributor shall have the right of first refusal on all Pay per View programs offered by Provider.

(e) Distribution Terms.

    (i)    Distributor shall distribute the Programs in their entirety as delivered by Provider without material degradation, and shall not cut or alter in any way any of the Programs. For the avoidance of doubt, Distributor shall distribute all advertisements, credits, notices, and other material contained in the Programs as delivered by Provider in their entirety and without modification or material degradation.  However, Distributor retains the right, in its sole discretion, to prohibit certain advertisers or advertisements from appearing on a Program.

    (ii)    Distributor shall not authorize or permit the distribution of Programs on any platform other than the Authorized Distribution Platform without the prior written consent of Provider.

    (iii)    All distribution of Programs hereunder shall be on a streaming or on-demand basis only. Distributor shall not give a license or a permit to any end-user to download (whether on a temporary rental basis or a permanent basis) the Programs or otherwise facilitate the procurement of a permanent copy of the Programs.

    (iv)    Distributor reserves the right, in its sole discretion, to decide the timing of the release of Programs onto the Authorized Distribution Platform as well as the length of time the Programs will remain available on the Authorized Distribution Platform.

(f) Distributor shall use the Authorized Distribution Platform to distribute the Programs in the Territory. Provider acknowledges and agrees that Distributor shall have sole control over the look-and-feel, branding, functionality, and commercial elements of the Authorized Distribution Platform and that Distributor may enhance, modify, and update the Authorized Distribution Platform at its sole discretion.

(g) The Authorized Distribution Platform through which the Programs are made available to viewers shall contain a clear and prominent attribution to Provider, using such Provider Licensed Marks as Provider shall approve in writing.

(h) Distributor shall use commercially reasonable efforts to ensure that its servers and the Authorized Distribution Platform have security features that are necessary to prevent unlicensed copying, downloading or distribution of the Programs by third parties and end users. Such security features shall be no less stringent than those provided by Distributor for other prime content distributed through the Authorized Distribution Platform. Distributor shall promptly notify Provider of any such unauthorized activity and cooperate reasonably with Provider to stop such activity.

## 5. PROMOTION.

(a) Distributor shall have the right, without prior approval of Provider, to use all or any part of any Program (video and/or still images) for promotional or marketing purposes.

(b) Each Party grants to the other Party a limited, non-exclusive, revocable license to use the granting Party's Licensed Marks solely for purposes of promoting the Programs as available on the Authorized Distribution Platform. All uses of a Party's Licensed Marks shall comply with the granting Party's trademark usage guidelines as specified in writing by the granting Party from time to time. All other uses of a Party's Licensed Marks or any other name, trademark, or logo of such Party, shall require prior written consent of such Party. Each Party will cease use of the granting Party's name, trademarks or logo (including the Licensed Marks) immediately upon written request of the granting Party.

(c) Notwithstanding the foregoing, Distributor shall have the right, without obligation to seek prior approval, to refer to Provider as a content provider in its general marketing and promotional materials; *provided* that use of any Licensed Mark in such materials shall be subject to the approval requirement of Section 5(b).

(d) Distributor shall not issue any press release or make any other public statement regarding this Agreement or the arrangements hereunder without the prior written consent of Provider.  Similarly, Provider shall not issue any press release or make any other public statement regarding this Agreement or the arrangements hereunder without the prior written consent of Distributor.

## 6. COMPENSATION TO PROVIDER.

(a) Distributor shall grant End Users the right to access the Programs on the Authorized Distribution Platform against monetary consideration. End Users will be directed to make in-app purchases using iTunes, Google App Store, Roku, or similar apps in accordance with Distributor's standard practices for its Authorized Distribution Platform.

(b) Distributor shall calculate view time by each End User in five-minute increments.

(c) Distributor shall pay to Provider compensation as detailed in Appendix B.  These payments shall remain in place for calendar year 2020.  Any changes to the payments in subsequent years shall be provided by Distributor to Provider at the beginning of each subsequent calendar year.  It is acknowledged that the Distributor calculates the time viewed by the End User in five-minute increments; if an End User views less than five minutes of content, no payment shall be due to Provider for that viewing.

(d) Distributor shall be solely responsible for all billing and collection of Pay-per-view Revenues. No later than thirty ( 30 ) days following the conclusion of each calendar

quarter (or partial calendar quarter, as applicable) during the Term, Distributor shall pay to Provider the Revenue Share Amount applicable to such calendar quarter. If the payment for any calendar quarter is less than One Hundred Dollars (US$100.00), then no payment will be due and the amount will roll over until the next quarter until the total accumulated Revenue Share Amount payment due to Provider is greater than One Hundred Dollars (US$100.00). Together with each Revenue Share Amount payment, Distributor shall deliver to Provider a report setting forth in reasonable detail the basis for calculation of such Revenue Share Amount generated during the applicable calendar quarter.

(e) Distributor shall keep and maintain all books and records relevant to the calculation of Revenue Share Amounts due hereunder throughout the Term and for a period of one ( 1 ) year thereafter for inspection and verification by Provider at reasonable times and upon reasonable notice. Provider shall have the right to audit such books and records no more than once during each calendar year during the Term and for one ( 1 ) year following termination or expiration of thereof. Such audit shall be performed by representatives of Provider or a mutually acceptable independent auditor, and shall be subject reasonable security and confidentiality requirements. All costs of an audit shall be paid by Provider, unless a payment deficiency for the audited period exceeds ten percent ( 10% ) of the payment paid for such period, in which case Distributor shall reimburse Provider for all such costs and expenses.

## 7.  USAGE DATA.

(a) Distributor shall provide or otherwise make available  to Provider usage data with respect to the Programs, including the following: (i) number of Program views (in the aggregate and on a Program-by Program basis) during the applicable time period, (ii) average time spent viewing each Program, (iii) any other traffic or demographic data (excluding any personally identifiable information) available to Distributor in conjunction with the display of the Programs on the Authorized Distribution Platform (such data, collectively, "**Usage Data**"). Distributor shall use its commercially reasonable efforts to provide such Usage Data via an automated viewing platform for real-time monitoring; *provided* that in the event such automated viewing platform is not reasonably available, Distributor shall deliver such Usage Data by email on a monthly basis, no later than the 15th day of the month following the month during which such Usage Data was collected. All Usage Data shall be deemed to be the Confidential Information of Provider except to the extent aggregated with data from two or more other distributors such that it is not attributable in any way to the Programs or Provider.

(b) Distributor agrees that the collection, storage, use, processing and disclosure of all data (including personally identifiable data, if any) collected, generated or otherwise obtained in connection with the distribution of the Programs shall comply with applicable law and the applicable terms of use and privacy policy. Distributor shall not disclose any personally identifiable information to Provider.

## 8.  CONFIDENTIALITY.

(a) "**Confidential Information**" means any and all information that is disclosed by or on behalf of one Party to the other Party and is designated as confidential or proprietary by the disclosing Party at the time of disclosure or otherwise would reasonably be understood by the receiving Party under the circumstances to be confidential or proprietary. "Confidential Information" does not include information that: (i) is or becomes generally known to the public through no breach of this Agreement by the receiving Party; (ii) is rightfully known by the receiving Party at the time of disclosure without an obligation of confidentiality; (iii) is independently developed by the receiving Party without use of the disclosing Party's Confidential Information; or (iv) the receiving Party rightfully obtains from a third party without restriction on use or disclosure.

(b) Each Party shall protect and keep the  other Party's Confidential Information in strict confidence using the same level of care as it uses to protect its own similar Confidential Information, and in any event no less than reasonable care and safeguards to maintain the confidentiality of and control over the Confidential Information. The receiving Party shall use the Confidential Information of the disclosing Party only as permitted under this Agreement and shall not disclose the Confidential Information of the disclosing Party to any third party except to the extent required by law or court order, or as otherwise necessary to enforce the receiving Party's rights hereunder. The receiving Party shall return or delete all Confidential Information of the disclosing Party promptly upon request of the disclosing Party.

## 9.  TERM.

(a) The term of this Agreement shall commence on the Effective Date and continue for a period of two ( 2 ) years (the "**Initial Term**") unless terminated earlier pursuant to Section 9(b).  Upon expiration of the Initial Term, the Agreement shall automatically renew for successive one ( 1 ) year periods (each, a "**Renewal Term**")   unless terminated earlier pursuant to Section 9(b).

(b) In the event that a Party materially breaches this Agreement, the other Party may terminate this Agreement upon Thirty (30) days' written notice, unless the breaching Party cures such breach prior to the expiration of such Thirty (30) day period.   Additionally, either Party shall have the right, for any reason or for no reason, to terminate this Agreement at the end of any Term following a Sixty (60) day written notice delivered in advance to the other Party.

(c) All provisions of this Agreement that, by their nature, should survive termination or expiration of this Agreement shall so survive.  Within Ten (10) days of the termination or expiration of this Agreement, Distributor shall cease distribution, and delete from its servers all Programs delivered by Provider hereunder, unless otherwise agreed to by both Parties in writing.

**10. REPRESENTATIONS AND WARRANTIES.**

(a) Each Party represents, warrants and covenants to the other that (i) its execution, delivery and performance of this Agreement is duly authorized by all requisite corporate authority, and (ii) it shall comply with all applicable laws in connection with its performance under this Agreement.

(b) Distributor represents, warrants and covenants that the Authorized Distribution Platform shall not infringe the intellectual property rights or any other right of any third party.

(c) Provider represents, warrants and covenants that the Programs provided to Distributor do not infringe upon the copyright or intellectual property right of any third party, and that Distributor's exploitation of the Programs hereunder in accordance with the terms and conditions hereof will not violate the rights of any third party, including any violation matter arising from the content of the Programs or the advertisements and/or promotion as provided by Provider.

(d) EXCEPT AS EXPRESSLY SET FORTH HEREIN, EACH PARTY EXPRESSLY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.

**11. INDEMNIFICATION.**

(a) Distributor agrees to defend, indemnify and hold Provider and its Affiliates, and each of their respective directors, officers and employees, harmless from and against any and all claims, suits, proceedings, costs, losses, reasonable attorneys' fees, damages and judgments incurred, claimed or sustained by third parties (collectively, **"Third Party Claims"**) arising out of or based upon (i) a breach by Distributor of this Agreement, (ii) a violation by Distributor of applicable law or right of any third party (including infringement of the intellectual property rights of any third party or any other right of a third party), and (iii) Distributor's operation of the Authorized Distribution Platform.

(b) Provider agrees to defend, indemnify and hold Distributor and its Affiliates, and each of their respective directors, officers and employees, harmless from and against any and all claims, suits, proceedings, costs, losses, reasonable attorneys' fees, damages and judgments incurred, claimed or sustained by third parties (collectively, **"Third Party Claims"**) arising out of or based upon (i) a breach by Provider of this Agreement, (ii) infringement of copyright or intellectual property right of any third party, and (iii) the use and distribution of the Programs, as delivered by Provider, in accordance with the terms of this Agreement.

(c) EXCEPT WITH RESPECT TO EACH PARTY'S INDEMNIFICATION OBLIGATIONS PURSUANT TO SECTION 11 OR A BREACH OF CONFIDENTIALITY OBLIGATIONS PURSUANT TO SECTION 8, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL,

CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING LOSS OF PROFITS, REVENUE, DATA OR USE INCURRED BY ANY PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**12. MISCELLANEOUS.**

(a) This Agreement may be executed in one or more counterparts and by facsimile or e-mail with scan attachment, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other party.

(b) This Agreement, the exhibits attached hereto and any ancillary documents constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof and thereof and supersede and cancel all prior agreements, negotiations, correspondence, undertakings, understandings and communications of the parties, oral and written, with respect to the subject matter hereof or thereof.

(c) This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania excluding its conflict of laws provisions. Any dispute under or in connection with this Agreement or any of the transactions contemplated herein shall be subject to, and the parties hereby submit to, the exclusive jurisdiction of, and personal jurisdiction within, the state and federal courts located within Luzerne County, Pennsylvania.

(d) Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or delegated by any of the parties (whether by operation of law or otherwise) without the prior written consent of the other party. This Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

(e) The parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement. Headings are provided for convenience only and shall not affect the interpretation of any substantive paragraph of the Agreement.

(f) All notices under this Agreement shall be in writing and shall be deemed to have been given when delivered personally, or, if sent by an overnight delivery service maintaining records of receipt or by facsimile with confirmation of receipt or other electronic means of written communication, on the first business day of actual receipt. Notices shall be addressed to the applicable Party at the address set forth above or at such other address as a Party shall specify by written notice to the other Party.

(g) If any term or other provision of this Agreement is determined to be invalid, illegal or incapable of being enforced by reason of any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any materially adverse manner to any of the Parties hereto.

In WITNESS WHEREOF, the parties have executed this Distribution Agreement as of the date first written above.

PROVIDER:  Game Changer Wrestling, L.L.C.

By: _Brett Hoffman_

Name: _____

Title: _Promoter_

DISTRIBUTOR: IndependentWrestling.tv, L.L.C.

By: _____

Name:  Gerard Durling

Title:    President

**APPENDIX A.**

**LICENSED MARKS**

Provider's Licensed Marks.

[TBD: *List all Provider's marks and any usage guidelines*]

Distributor's Licensed Marks.

[TBD: *List all Distributor's marks and any usage guidelines*]

**APPENDIX B.**

**COMPENSATION PACKAGES 2020**

| Product/Service | Retail List Price | Revenue Share To Provider |
|---|---|---|
| Archived Content Viewed on IWTV * | N/A | $0.30 per hour, paid in five-minute increments * |
| Original Non-spectator Produced Content Viewed on IWTV | N/A | $0.45 per hour, paid in five-minute increments |
| Live Content Viewed on IWTV during live stream * | N/A | $0.60 per hour, paid in five-minute increments * |
| Pay per View Productions | N/A | 50% of Net Sales (defined as Gross Sales minus "transaction fees" of 25% of Gross Sales) |
| Blu-ray | $20.00-$40.00 | $20.00 @ $9.00 ; $40.00 @ $18.00 |
| DVD | $15.00 - $30.00 | $15.00 @ $6.50 ; $20.00 @ $9.00 $25.00 @ $11.25: $30.00 @ $13.00 |
| MP4 | $7.99 - $14.99 | $7.99 @ $3.50 ; $9.99 @ $4.50 ; $11.99 @ $5.50 ; $14.99 @ $6.75 |
| VOD | $7.99 - $14.99 | $7.99 @ $3.50 ; $9.99 @ $4.50 ; $11.99 @ $5.50 ; $14.99 @ $6.75 |
| LICENSED MERCHANDISE | $.99 - $99.99 | 50% of earned revenue after costs |

\* NOTE:  Provider shall be guaranteed a minimum of One Thousand Dollars ($1000.00) for each Live Stream Event provided by Provider to Distributor.  This guarantee does not extend to Pay per View Events.

**APPENDIX C.**

**PRODUCTION EXPENSES 2020.**

**Personnel Expenses.**
$200 for two camera operators, live production switcher (if schedule permits), promotion is allotted for 3 hours of production based on advertised event start time.

$300 for three camera operators, live production switcher (if schedule permits), promotion is allotted for 3 hours of production based on advertised event start time.

$50 per 30 minutes for time above allotted 3 hours from advertised event start time.

Event start time is either the advertised bell time or the first match (dark matches are included if they are filmed) on the event whichever is earlier.

**Travel Expenses.**
$50 for 2 hours or less each way from production team domicile.

$75 for 2-3 hours each way from production team domicile.

$100 for 3-4 hours each way from production team domicile.

$125 for 4-5 hours each way from production team domicile.

$150 for 6-9 hours each way from production team domicile.

$200 for 10+ hours each way from production team domicile if airfare is not required.

Airfare required for production is to be billed back to promotion at the end of each month after the event has been held.  All airfare will be secured by Distributor.

**Lodging Expenses.**
For multiple day events or if air travel is required, a hotel room or Airbnb room is required. The expense will be billed back to the promotion at the end of each month after the event has been held.  All lodging accommodations will be secured by Distributor.

Exhibit "B"

**From:** gamechangerwrestling <gamechangerwrestling@yahoo.com>
**Sent:** Tuesday, December 1, 2020 9:44 PM
**To:** Gerard Durling <gerard@iwtv.live>
**Subject:** GCW Event Plans

Per your request, I am emailing you to confirm my intentions for upcoming shows.

I am going to be using a different production crew and move our streams to alternate platforms for the following events:

12/5 - Las Vegas
12/31 - Atlantic City
1/1 - Atlantic City

If possible, please seek travel credit or refunds for travel for those flights/hotels I have already paid for in Las Vegas.

Thanks,
Brett

Sent from my Verizon, Samsung Galaxy smartphone

1

V0003-071

Exhibit "C"

## HOURIGAN, KLUGER & QUINN
A PROFESSIONAL CORPORATION

ALLAN M. KLUGER
RICHARD M. GOLDBERG
JOSEPH E. KLUGER*
DONALD C. LIGORIO
RICHARD M. WILLIAMS
MICHAEL A. LOMBARDO III
BRIAN Q. MCDONNELL
NICOLE M. SANTO**
KATHLEEN QUINN DEPILLIS
KEVIN M. WALSH, JR.

ANDREW HOURIGAN, JR.
1949-1978

ARTHUR L. PICCONE
1958-2019

JOSEPH A. QUINN, JR.
RICHARD S. BISHOP
JAMES T. SHOEMAKER*
MICHELLE M. QUINN
TERRENCE J. HERRON
KEVIN C. QUINN
BRIAN P. STAHL*
LARS H. ANDERSON
CHRISTOPHER C. QUINN
RYAN M. MOLITORIS

* ALSO MEMBER NY BAR
** ALSO MEMBER NJ BAR

LAW OFFICES
600 THIRD AVENUE
KINGSTON, PA 18704-5815

(570) 287-3000
FACSIMILE (570) 287-8005

E-MAIL: HKQ@HKQLAW.COM

www.HKQLAW.com

SUITE THREE HUNDRED
434 LACKAWANNA AVENUE
SCRANTON, PA 18503-2014
(570) 346-8414
FACSIMILE (570) 287-8005

Ext. 1139
Direct Dial: 570-287-5383
jkluger@hkqlaw.com

December 7, 2020

*via certified mail, return receipt requested*
*and via email: gamechangerwrestling@yahoo.com*
Mr. Brett Hoffman
Game Changer Wrestling, LLC
315A Princeton Road
Haddonfield, NJ 08033

RE:   **IndependentWrestling.tv, L.L.C. v. Game Changer Wrestling, LLC**
      **Our File No.: V0003-071**

Dear Mr. Hoffman:

Please be advised that this law firm represents IndependentWrestling.tv, L.L.C. with respect to that certain Distribution Agreement dated March 19, 2020 between IndependentWrestling.tv, L.L.C. ("IWTV") and Game Changer Wrestling, LLC ("Game Changer").

The Distribution Agreement clearly provides that Game Changer granted to IWTV an exclusive license to produce and distribute Pay per View Events and the Programs in the Territory (as such terms are defined in the Distribution Agreement). Notwithstanding the very clear language of the Distribution Agreement, Game Changer has notified IWTV by email dated December 1, 2020 that it intends to utilize a different production company and distribution system for events which are governed by the Distribution Agreement, including an event in Las Vegas dated December 5, 2020, an event in Atlantic City dated December 31, 2020, and another event in Atlantic City dated January 1, 2021.

Additionally, Game Changer has not provided to IWTV the specified number of live stream programs as per Section 4(c), and has also violated the confidentiality terms of Section 8 of the Distribution Agreement.

24719542

Game Changer Wrestling, LLC
December 7, 2020
Page 2

Such actions and anticipated actions by Game Changer are direct violations of the Distribution Agreement, which breaches will cause losses to IWTV including, but not limited to, all actual losses and loss of profit which IWTV may suffer.

To that end, I address your attention to Section 11(a) of the Distribution Agreement regarding the indemnification obligations of Game Changer, and I further direct your attention to Section 12(c) of the Distribution Agreement in which not only the laws of the Commonwealth of Pennsylvania will govern, but exclusive jurisdiction is with the state and federal courts located within Luzerne County, Pennsylvania.

My client intends to reserve all of its rights and remedies, none of which are waived by the forwarding to you of this notice of breach and anticipatory breach, and our client has authorized us to take any and all legal action necessary to enforce the terms and conditions of the Distribution Agreement in Luzerne County unless the breaches are cured without delay.

Accordingly, in order to avoid the obvious additional expense, inconvenience and embarrassment of legal proceedings, I urge you to comply with the terms of the Distribution Agreement including insuring that IWTV remains the exclusive provider for all applicable events. Additionally, please take whatever steps are necessary to ensure that IWTV receives prompt payment of all outstanding monies due to it.

Sincerely,

Joseph E. Kluger

JEK/jmr
cc:    Jeffrey J. Pyros (via email, only)

2471954.2



U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)        $ _____
☐ Return Receipt (electronic)      $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required         $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$

Total Postage
$

Sent To     Mr. Brett Hoffman
Street and A  Game Changer Wrestling, LLC
             315A Princeton Road
City, State,  Haddonfield, NJ  08033

PS Form 3